Date signed October 28, 2013



_____
ROBERT A. GORDON
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### (at Baltimore)

| | | |
|---|---|---|
| In re: | * | |
| Robert Wallace | * | Case No. 09-32921-RAG |
| Cherie J. Brooks-Wallace | | Chapter 7 |
| | * | |
| Debtors | | |
| | * | |

\* \* \* \* \* \* \*   \* \* \* \* \*

| | | |
|---|---|---|
| Manheim Remarketing, Inc. | * | |
| Manheim Automotive Financial Services, Inc. | | |
| | * | |
| Plaintiffs | | |
| | * | |
| v. | | Adversary No. 10-00128-RAG |
| | * | |
| Robert Wallace | | |
| Cherie J. Brooks-Wallace | * | |
| | | |
| Defendants | * | |

\* \* \* \* \* \* \*   \* \* \* \* \*

**MEMORANDUM OPINION IN SUPPORT OF ORDER
ENTERING JUDGMENT AS TO LIABILITY BY DEFAULT**

1

I.   **Preliminary Statement**

On November 24, 2010 Robert and Cherie Wallace (Defendants) filed their Voluntary Petition (Petition) for relief under Chapter 7 of the United States Bankruptcy Code.[1] The dispute addressed in this Opinion finds its genesis in pre-bankruptcy transactions that led to litigation entitled *Manheim Pennsylvania Auction Services, Inc. d/b/a Manheim Pennsylvania v. DCWR, Inc. t/a Bith Group, Robert D. Wallace and Cherie J. Brooks-Wallace,* Case No. 09-cv-174 filed in the U.S. District Court for the District of Maryland (District Court Litigation). The Plaintiff in the District Court Litigation essentially sought to enforce the same bundle of rights and claimed indebtedness that Manheim Remarketing, Inc. (Manheim) and Manheim Automotive Financial Services, Inc. (MAFS) (Plaintiffs), seek to have declared non-dischargeable in this litigation.[2]

The filing of the Petition stayed the District Court Litigation and the battle tumbled into this forum when this Adversary Proceeding was commenced by the filing of the Complaint to Determine Dischargeability of Debts (Complaint) on March 1, 2010. The Complaint sought to have approximately $834,034.66[3] declared non-dischargeable on the basis of the Defendants' alleged false pretenses, false representations, actual fraud (Section 523(a)(2)(A)) and for their alleged fraud, defalcation, embezzlement or larceny while acting in a fiduciary capacity (Section 523(a)(4)).[4] The unrepresented Defendants filed an Answer to Complaint to Determine

---

[1] Unless otherwise noted, all statutory citations are to the Bankruptcy Code (Code) found at Title 11 of the United States Code and all rule citations are to the Federal Rules of Bankruptcy Procedure (Rules).

[2] Manheim is the successor-in-interest to the Plaintiff in the District Court Litigation in addition to other similarly named, and presumably related, entities.

[3] It is difficult to determine exactly how much the Plaintiffs claim in damages.

[4] Manheim's fellow creditor GBBR Federal Credit Union (GBBR) filed another Adversary Proceeding (Case No. 10-00126) that likewise sought to except from the Wallaces' discharge the indebtedness due GBBR. The defaults of the Defendants' in that case were substantially similar to those described in this Opinion and a similar opinion, and default judgment order, will be issued in Case No. 10-00126.

2

Dischargeability of Debts (Answer) (Dkt. No. 6) on March 31, 2010. However, history teaches that was to be their last meaningful substantive act.

The Defendants repeatedly failed to either provide discovery or obey the Court's order regarding those failures and took other action purposefully calculated to block the resolution of this case. Eventually, it became clear that the Defendants were behaving that way because they did not intend to offer a defense on the merits. Hence, their conduct convinced the Court that only reasonable course was the entry of judgment by default as to liability.[5]

## II. The Complaint's Allegations

### A. The Parties

Manheim is a Delaware corporation with business locations at 1190 Lancaster Road, Manheim, Pennsylvania and 7120 Dorsey Run Road, Elkridge, Maryland. Manheim conducts wholesale motor vehicle auctions at those locations. Per Manheim's allegations, only licensed automobile dealerships and their authorized agents are permitted to bid on, and purchase, vehicles.[6] MAFS is also incorporated in Delaware and operates its business from the same locations. Per the Complaint, MAFS provides dealers with floor plan financing to complete their purchases. Per its agreement with MAFS, Manheim acts as servicing agent on MAFS's financing.

It is alleged that at the time they filed their Petition, Mrs. Wallace and Mr. Wallace were President and Vice-president, respectively, of DCRW, Inc. d/b/a Bith Group (Bith). Bith was

---

[5] The Court has apologized to the parties for the delay between the filing of the final papers and this decision. However, the apology, and the fact that the reasons for it were both serious and beyond the Court's control, bears repeating here.

[6] It appears from the Complaint that a state issued dealership license is required to participate and also that would-be bidders register with Manheim.

3

formerly licensed as a Maryland motor vehicle dealership and it was registered to participate in Manheim's auctions. Bith used MAFS inventory financing to consummate its purchases.

The Complaint alleges a series of nefarious transactions engineered by the Wallaces and committed either individually, through Bith, or in combination with others, in connection with purchases at Manheim auction sales. Manheim claimed that this conduct was either fraudulent or in breach of trust and that it caused the monetary damage identified above.

### B. Count One

In support of its claims under Section 523(a)(2)(A), the Plaintiffs alleged that on June 13, 2008 Bith signed secured loan documents in favor of MAFS to memorialize and confirm a floor plan financing loan of $200,000.00. The Defendants guaranteed the loan. In 2008 Bith used that financing to purchase ten vehicles. However, Bith failed to make any payments against this purchase and ignored the demand that the ten vehicles (and others) be returned. In response, Plaintiffs accelerated the entire indebtedness and sought immediate possession of all the vehicles they believed themselves to be entitled to.

Because the debt was not paid and the vehicles were not voluntarily returned, on January 28, 2009 the District Court Litigation was commenced. On the same day, a Temporary Restraining Order (TRO) prohibiting Bith from selling or otherwise disposing of the seven vehicles still unrecovered at that time was granted by the District Court.[7] Plaintiffs also sought a total of $182,235.00 in damages.[8]

---

[7] The Complaint does not state it explicitly but the allegations seem to indicate that three vehicles were returned after the TRO's entry. The vehicles not returned were mainly 'high-end' – a 2006 Cadillac DTS (DTS), a 2006 Hummer H3, a 1999 Lincoln Navigator (Navigator), a 2001 Nissan Pathfinder, a 2008 Audi DD, a 2007 Cadillac Escalade (Escalade) and a 2004 Porsche 911.

[8] This amount differs significantly from the sums claimed in the Complaint.

4

The Complaint's description of the events that transpired during the course of the District Court Litigation is somewhat confusing. Nevertheless, it appears that in response to the TRO, on February 17, 2009, the Defendants, through Bith, represented that six vehicles had been legitimately sold prior to the TRO's entry while admitting that the Escalade was in their possession. The District Court vacated the TRO and ordered the Escalade's production (along with the bills of sale evidencing the sale of the remaining six vehicles) within ten days. Bith did not comply and that caused the issuance of three additional turnover orders. Finally, the Complaint alleges, on June 4, 2009, the Defendants did comply with the Orders, except for failing to provide a bill of sale for the Navigator.[9]

Plaintiffs requested sanctions in response to the post-TRO sale of the DTS. That request was granted on October 1, 2009 and the Defendants were required to deposit $20,390.00 with the Clerk. They were subsequently ordered to pay attorney's fees and costs incurred in the amount of $3,525.00. The upshot is that Manheim resold four vehicles at auction and alleges to have set off the proceeds against the outstanding debt. Per the Complaint, these transactions left a total indebtedness of $149,970.00 due Plaintiffs.

### C. Count Two

In support of its first claim under Section 523(a)(4), Count Two alleges that Mr. Wallace misappropriated three checks drawn by the Plaintiffs to L&A Auto Sales (L&A) in payment for three L&A vehicles sold at auction. The checks had a total value of $15,680.00 and the Plaintiffs allege Mr. Wallace deposited each check for his own benefit. Count Two seeks to have the sum of $15,680.00 excepted from the Defendants' discharge.

---

[9] The Complaint also alleges that one bill of sale proves that the DTS was sold on March 1, 2009, subsequent to the TRO's entry.

### D. Count Three

In support of the second claim under Section 523(a)(4), Count Three asserts a conspiracy between the Defendants, Bith and other identified automobile dealerships whereby several (mainly high-end) vehicles were bought and resold multiple times at Manheim auctions from the fall of 2008 to the winter of 2009 with fraudulent, worthless payment checks being issued to Manheim by the conspirators. While the gist of the asserted liability is fairly intelligible, it is difficult to determine the precise amount of damages attributed to the Defendants' conduct in violation of Section 523(a)(4).[10]

### III. Procedural History

A Pretrial Conference (Conference) was held on May 18, 2010. The Plaintiffs were represented and both Defendants attended, albeit without counsel. Prior to the Conference, on March 30, 2010, Defendants filed a Motion for Extension of Time to Answer Complaint (Extension Motion) and asserted that they needed additional time to 'engage' an attorney and then bring that attorney up to speed. The Extension Motion asked that the deadline for answering be extended to April 30, 2010. Once at the Conference, the Defendants again voiced a strong desire to obtain counsel. Mr. Wallace stated that they had arranged for counsel but just that morning, the arrangement had fallen through. Accordingly, he asked for additional time to raise the necessary funds – to be supplied in part by his father – and complete the hiring. Plaintiffs objected vigorously to the delay, asserting that the Defendants had used similar pleas to improperly delay the District Court case. Nevertheless, the Court delayed the commencement of discovery by forty five (45) days to allow Defendants, an additional, extended opportunity to

---

[10] Paragraphs 76 thru 78 identify separate damage amounts of $132,440, $135,944.66, $405,060.80, $150,000 and $250,000, all somehow connected to the multiple sales/fraudulent check transactions alleged. How each total is connected to the Defendants conduct is not at all clear.

obtain counsel.[11] The pre-trial schedule was placed on the record without further objection from the Wallaces. Discovery was to be completed by December 31, 2010 and trial was scheduled for April 12, 2011 at 10:00 a.m. On June 1, 2010, the Scheduling Order (Dkt. No. 10) was entered and a copy was mailed to Defendants on June 3, 2010.

On December 17, 2010, a Notice of Service of Discovery Materials (Notice) (Dkt. No. 12) was filed by the Plaintiffs. The Notice memorialized the service of interrogatories and requests for production of documents on the Defendants. On February 2, 2011, Plaintiffs' Motion for Summary Judgment (Summary Judgment Motion) (Dkt. No. 15) was filed. The Defendants' Response to the Plaintiffs Motion for Summary Judgment (Dkt. No. 17) was filed on February 14, 2011 and a hearing was scheduled for March 23, 2011. However, the Defendants filed a Request for a Continuance/Postponement (Dkt. No. 25) in which Mr. Wallace indicated he had an employment based conflict on the hearing date. The hearing was continued until May 2, 2011.

On February 28, 2011, Plaintiffs' filed a Status Report (Dkt. No. 19), in which Plaintiffs reported that Defendants had not responded to the written discovery requests served in December. On March 1, 2011, the Defendants filed a Case Update (Dkt. No. 20) that was a study in contrast to Plaintiffs' Status Report. In relevant part, Defendants stated, "I (sic) have participated in discovery when requested and provided relevant information requested…" The next day, Plaintiffs filed Plaintiffs' Supplement to Their Status Report (Dkt. No. 22) and denied, among other things, that the Defendants had provided discovery.

The summary judgment hearing was held on May 2nd. Despite the fact that the hearing was continued at their request, the Defendants failed to appear. Yet, the Court found that the Summary Judgment Motion did not satisfy the standard of Federal Rule of Civil Procedure Rule

---

[11] The Defendants never hired counsel.

56(c) (made applicable by Rule 7056) and the motion was denied.  Following the hearing, and in light of the fact that the original trial date had passed, the Court entered a new Scheduling Order (Dkt. No. 30) on May 10, 2011.  The new trial date was October 11-12, 2011.[12]

On May 25, 2011, the Plaintiffs filed a Motion to Compel and for Sanctions (Dkt. No. 32) (Motion to Compel) as a result of the Defendants failure to respond to the written discovery and their failure to respond to the Plaintiffs efforts to resolve the non-compliance without court intervention.[13]  The Defendants did not respond to the Motion to Compel.  On June 20, 2011, the Court issued an Order Compelling Discovery (Discovery Order) (Dkt. No. 33) that required Defendants to provide requested documents and respond to interrogatories within fifteen days.  A copy of the Discovery Order was mailed to the Defendants on June 22, 2011.[14]

On July 11, 2011, twenty-one days after the Discovery Order was entered, the Defendants filed a letter (Letter) (Dkt. No. 38) asking for a hearing.  The Letter stated in part:

> In regards (sic)…the motion to Compel and Sanctions for the plaintiff Manheim Remarketing Inc., the initial filing was never received by the debtor.  We are unaware of what could have caused this mix up, but the order by the court was the first notification we received regarding the initial motion.
>
> \*          \*          \*
>
> Is it possible for us to have an opportunity to respond or a court date to discuss?  We cannot afford any sanctions and are doing our best to respond to these numerous requests and motions.
>
> We have learned our lesson regarding not responding on our other proceeding with GBBR.  We have never missed a filing since the time of the initial filing and would appreciate an opportunity to substantiate our case.

---

[12] There was little, if any, compliance by either side with the first Scheduling Order.

[13] At the Conference, Defendants were ordered to provide Plaintiffs' counsel with a phone number where they could be reached.  Defendants provided a phone number on the record but it proved to be virtually useless as a communication tool.

[14] The Discovery Order also contemplated an award of attorney's fees and costs to the Plaintiffs.

8

The next day, Defendants filed a Request for a Continuance/Postponement (Request for Continuance) (Dkt. No. 37) that requested a six month stay of this litigation because the "mother of the debtors will be undergoing high risk brain surgery on July 21, 2011 to remove two aneurisms" and would thereafter require the Debtors' uninterrupted attention. On July 18, 2011, the Plaintiffs filed their Opposition to Defendants' Request for a Continuance/Postponement (Dkt. No. 40) and asserted that because the Defendants had misrepresented facts in their filings, failed to appear at hearings and had yet to respond to the written discovery, the Request for Continuance should be denied. The Plaintiffs neglected to mention the outstanding, and unsatisfied, Discovery Order.

On August 30, 2011, a hearing was held on the various pending matters.[15] Plaintiff's Counsel indicated that Plaintiffs still had not received responses to their written discovery. Mr. Wallace, the only Defendant to appear that day, first admitted that the Defendants had received the discovery requests and the Discovery Order but then quickly backtracked and denied receiving them, notwithstanding both his earlier oral statements and the representations he made in his Letter. At that point, the Court's patience was exhausted. The Wallaces had left no doubt that would not participate in the case by providing a legitimate defense. The Court therefore concluded that a default judgment would be entered.[16]

---

[15] A hearing was also held in Case No. 10-00126 at the same time, in part to deal with an identical request to stay that litigation. The Court took testimony from Mr. Wallace in that case and denied the request mainly because the Court concluded that Mr. Wallace had made false statements in the Request for Continuance. The request was likewise denied in this case.

[16] This conclusion was reached as much because of the Wallaces' pattern of evasive conduct in Case No. 10-00126. Because of the Plaintiff's legitimately aggressive prosecution in Case No. 10-00126, the Wallaces conduct in that case appears on the surface to be more evasive and dilatory. However, their conduct in this case was no less in bad faith because they simply did nothing at all. Nevertheless, it should be emphasized that the Oversigned did come to view the Wallaces' conduct broadly and as representing an overall contempt for the justice system as a result of presiding over both cases at the same time.

**IV.     Jurisdiction**

This Court has jurisdiction over this adversary proceeding in according with 28 U.S.C. §§157 (b)(2)(I) of the Bankruptcy Code.  Venue is likewise proper under 28 U.S.C. §1409(a).

**V.      Analysis**

Federal Rule of Civil Procedure 37(b)(2)(A)(vii), as incorporated by Rule 7037, applies in this Adversary Proceeding.  A default judgment may be entered against a party, "if [the party]… fails to obey an order to provide or permit discovery …".  A default judgment is one of the most severe sanctions that a court may use under Rule 7037 and is warranted only where "the party's noncompliance represents bad faith and callous disregard for the authority of the [bankruptcy] court and the Rules".  *Mutual Fed. Sav. and Loan Ass'n v. Richards & Assocs., Inc.*, 872 F.2d 88, 92 (4th Cir. 1989).  The Court must consider: "(1) whether the noncomplying party acted in bad faith; (2) the amount of prejudice his noncompliance caused his adversary, which necessarily includes an inquiry into the materiality of the evidence he failed to produce; (3) the need for deterrence of the particular sort of noncompliance; and (4) the effectiveness of less drastic sanctions."  *Id*. (internal citations omitted).  The record in this case, viewed alongside that of Case No. 10-00126, supports the entry of a default judgment.

        **A.     The Wallaces' Bad Faith**

A defendant's repeated failure to diligently comply with discovery requests reflects bad faith and disrespect for the authority of the Court.  *Mutual Fed. Sav. and Loan*, 872 F.2d at 93 (finding that noncompliance and haphazard compliance with three discovery orders substantially supported a finding of bad faith).  From the May 2010 Conference until the final August 30, 2011 hearing, the underlying constant in this case has been the Defendants' rigid unwillingness to provide discovery and abide by the Discovery Order.  Against the background of what had

10

transpired in Case No. 10-00126, Mr. Wallace's contradiction at the August 30th hearing of what he represented in the Letter was the final straw. The Oversigned had become convinced that the Wallaces would never allow either case to be properly prosecuted and would continue to treat the system with contempt. This adds up to bad faith and is reflective of the Defendants' decision not to rectify their pattern of non-compliance.[17]

### B.  Prejudice to the Plaintiffs

The written discovery requests were well-tailored to either uncover relevant facts not in the Plaintiffs possession or to narrow the parameters of relevance at trial. In a dischargeability case involving allegations of fraud, precision in discovery and presentation is particularly important. Because the Defendants' state of mind is a key consideration, the Plaintiff must be permitted a reasonable opportunity to explore all facts relevant to that element. What the Plaintiff got in this case was a stone wall, built on the Defendants' contradictory assertions that either (a) they had not received the discovery or (b) they had received it and would respond if given more time. Both positions cannot be true and to allow the Defendants to maintain them spins the litigation into the Twilight Zone. The result is that the Plaintiffs were prejudiced by both the unwarranted expenditure of time and money and the inability to effectively prosecute their case.

### C.  The Need for Deterrence and the Effectiveness of Less Drastic Sanctions

The default judgment, "must be available…in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such a sanction, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *National Hockey League v. Metropolitan Hockey Club, Inc.*, 427 U.S. 639, 643 (1976). However, the court should consider

---

[17] To the extent a pre-sanction warning of likely consequences was required, *See Hathcock v. Navistar Int' Transp. Corp.*, 53 F.3d 36, 40 (4th Cir. 1995) (a defendant should be warned before a default judgment is entered ), the Defendants were provided with multiple warnings in Case No. 10-00126 of what their behavior might bring about.

if a lesser sanction would do before granting a default judgment.  *See e.g. Anderson v. Foundation for Advancement, Education, and Employment of Am. Indians*, 155 F.3d 500, 504-5 (4th Cir. 1998).  The Oversigned became intimately familiar with the Wallaces' tactics over the year and a half that this case, and Case No. 10-00126, unfolded.  On several occasions, they did not tell the truth and made it crystal clear that they were not going to meaningfully participate in either case or be bound by court orders.  Holding hearings, entering orders, and assessing fines became meaningless which left the entry of default judgments as the only realistic alternative.

## VI.     Conclusion

A default judgment as to liability, with the Plaintiff given an opportunity to prove damages, shall be ordered.

**End of Opinion**